321-0366, the people of the state of Illinois, appealee by J.D. Bella v. Doyle Eugene Nelson, Jr., appellant by Demetrius Golfus. The vote sign is ready to proceed. Mr. Golfus, you may proceed. Good afternoon. I'm Demetrius Golfus. I'm from the Office of the State Appellate Defender, and I represent Doyle and Nelson. May it please the Court, Counsel. Your Honor, Doyle and Nelson was convicted of felony murder under a theory of accountability, where his co-defendant, Xavier Marks, shot and killed Xarius Thayer during an alleged attempted robbery. Mr. Nelson received a sentence of 55 years imprisonment, and his co-defendant, Mr. Marks, received a sentence of 45 years imprisonment. We've raised seven claims on appeal. Although all the claims are important and merit your Honor's attention, I'm going to be focusing my argument today on only two of them. First, I plan to briefly address Mr. Nelson's claim of an improper sentencing disparity between him and his co-defendant, Mr. Marks, particularly in light of this Court's recent decision in Marks' direct appeal. Then I plan on addressing, with the remainder of my time, the first issue raised in the briefs, which is Mr. Nelson's contention that his Miranda waiver was invalid. With that said, I'm happy to answer whatever questions the Court has concerning any of the issues that have been raised. With respect to the sentencing issue, a defendant arguing an improper disparate sentence must establish, at the very least, that he and his co-defendant are similarly situated and equally culpable. Mr. Nelson has done so in this case. There's no dispute that Mr. Marks, his co-defendant, was the more culpable co-defendant, as he was the person who shot and killed the victim. But also four years younger. Correct. He was four years younger. And that, with respect to the similarly situated part of the analysis, the State's only argument hinges on the age. The State argues that because of that age difference, Mr. Marks had greater rehabilitative potential. And that's also the only reason that the trial judge gave in Mr. Nelson's case to give Nelson 10 years more imprisonment than what Marks received. Now, we acknowledge that, generally speaking, juveniles have more rehabilitative potential than adults, including young adults. But that's not always the case. And that's not the case with Mr. Marks. As this Court acknowledged in its decision this past March in Marks' direct appeal, the trial judge in Marks' case found that Marks was permanently incorrigible and beyond the possibility of rehabilitation. So, Mr. Nelson actually has more rehabilitative potential than Marks. Mr. Nelson is, frankly, better situated than Mr. Marks and is more deserving of a lesser sentence. So this really is a textbook case of an improper disparate sentence. There is no basis for Nelson to receive 10 more years imprisonment than what Marks received. Therefore, in the event this Court does not grant relief under issues 1 through 6, Mr. Nelson asks that you reduce his sentence from 55 years to 45 years, if not something a little less than that. With regard to the Miranda issue, we certainly agree that our position is that reversal of the conviction is required for all six issues. But with respect to the Miranda issue, the interrogation video shows that when Mr. Nelson was being Mirandized by the detective, Mr. Nelson interrupted the detective and asked what would happen to him if he refused to answer your questions. And the detective responded, and I'm quoting to the best of my ability, well, you're going to be charged with first degree murder. Can I ask you a question? Sure. So there's kind of a continuum in these types of cases, but would you agree that if the officer had responded something along the lines of, well, based upon all the information we have right now, you would be charged with murder, that that would be okay, that particular response? I think that would be okay because he's separating it. What's the difference ultimately between what the defendant was told and what I just asked? Because in your hypothetical, you're linking you're going to be charged with murder to the evidence that the officers have before them that they know of, whereas in reality with Mr. Nelson, that's not what he said. He said that in response to what's going to happen if I remain silent. You're going to be charged with murder. So that comes across as a consequence of remaining silent. You're going to be punished for being silent. And that's problematic. Counsel, do you discern from that tape? The tape was very difficult to listen to, but you're telling us that's what specifically the defendant said? That's exactly what was said. And I acknowledge that the interrogation video was not the clearest. Obviously, we have a record of the trial court and the parties having problems. We had IT come in. Ultimately, all the parties in the court agreed the video was sufficient audio-wise. I understand that. Is there a consensus on both sides here as to what he said before that statement was made by the officer, by the detective? I'm representing as an officer of the court that that's what was said. I can't speak for Ms. Miller. From her brief, she… I understand. I just wanted to know if I was missing something, if there had been an agreement as to what was said. I know that there was agreement to send it back, even in its poor state. Oh, so you're talking about was there an agreement in the trial court as to what was said at the time of the Moran warnings. That was not addressed at all. Good. Thank you. Yeah. So it's problematic for two reasons. Part of her right to remain silent is if you choose to remain silent, you're not going to be punished for it. So when you tell a defendant, if you remain silent, you're going to be charged for murder, that's inconsistent with her right to remain silent. And in order for a defendant like Mr. Nelson to knowingly waive her right to silence, the right to silence has to be clearly and understandably conveyed to them. And when the prosecutor tells them in response to the question, what's going to happen if I choose not to talk to you, you're going to be charged with murder, that's not clearly and understandably conveying the right to silence to Mr. Nelson. Therefore, Mr. Nelson cannot knowingly waive it. The other problem is what the officer told them is coercive and it renders the waiver involuntary. What the officers conveying by saying what he said is, if you're in Mr. Nelson's position, the only way you can avoid a potential murder charge is by agreeing to talk to the officers. That's coercive. There is one other part of the interrogation video that I want to point out because I think it shows that the intent of this detective was to leverage a murder charge against Mr. Nelson during this interrogation. After they get incriminating statements from Mr. Nelson, the officer says to him, I appreciate your cooperation. Again, I'm paraphrasing. I appreciate your cooperation. You're not going to be charged. The detectives then leave the room, and then a short time later they come back. They press Mr. Nelson for certain things that he didn't get initially, the location of the murder weapon and admission from Mr. Nelson that he patted down the victim. Nelson doesn't give them either thing. He makes no further incriminating statements. In response to that, the detectives say, you're going to be charged with murder. So what we have here is initially the detective is using a murder charge as a threat to get him to waive his rights. Then after he finally makes the incriminating statements, he's using it as a reward, kind of as a thank you, you're not being charged, knowing that they're going to come back into that interrogation room to try to get more information out of them. They're trying to put them in a place of safety to soften them up, knowing that they want to get more out of them. Counsel, do you recall that, it's my recollection, I may be incorrect, but I watched it recently, that it was the defendant again who asked the question and the officer gave them that answer. Am I incorrect about that? What's going to happen now coming from your client and the officer saying, you're not going to be charged, or words to that effect? I don't recall. I can't disagree with you. I don't recall that particular exchange. It's possible. I don't remember. But it shows that this detective was using a carrot and a stick approach with Mr. Nelson, leveraging a murder charge. Although the latter statements don't invalidate the waiver, like the initial statement, the threat, it gives it a complete picture of what this officer is intending. Counsel, after the first question that the officer gave, what happened when he said, if I don't answer the questions, wasn't there a second question that the police officer, the defendant asked, what if I don't answer questions? And then the police officer replied, it can happen. What do you think the it can happen was referencing then? A charge? I think it's, yeah, a charge of murder. I think, to be perfectly candid, the officer probably realized that what he just said is pretty bad, and he should not have said that. And he was trying to walk it back. And the problem is, what the officer said next, it can happen, that doesn't negate what he said initially. At the very best, it leaves the right to silence ambiguous. What he should have said, he could have done two things. He could have said, Mr. Nelson, let me finish reading you your rights, and it might clarify it for you. And if it doesn't clarify it, then we can talk about it some more. Because really, when you tell someone they have a right to remain silent, that should be self-explanatory. The record suggests it probably wasn't very self-explanatory to Mr. Nelson, and he may have needed more. If he needed more, the detective should have said, if you choose to remain silent, you can do that. We're just not going to get your story from you. And then us detectives and the prosecutor are going to look at the evidence, and based on that evidence, we're going to decide whether or not to charge you with murder. That's what the detective should have said. He could have even taken a step further and said, you know what? I misspoke. I should not have said what I said to you. If you choose to remain silent, that doesn't mean anything's going to happen to you. He could have gone even a step further and said that. But he didn't. He left things. He muddied up the right to silence, and you can't do that and expect a knowing waiver. And then expect the defendant not to be coerced into wanting to talk to you, because you've told him the only way you're not going to be charged is if you agree to talk to us and cooperate. So for all those reasons, the waiver is invalid. Looking at the evidence, we think that this error warrants reversal both under a plain error analysis and also due to ineffective assistance of counsel. For the reasons I've already discussed, the error is clear and obvious. It's an invalid waiver. Counsel had no strategic reason to not move to suppress this, to want the video and evidence. Counsel's theory at trial was that the underlying felony that was charged, attempted robbery, did not happen. The video directly contradicts that, because in the video you have Mr. Nelson telling the detectives that his co-defendant, Marks, was going to commit a robbery. So the whole trial was about was there an attempted robbery, was this underlying felony established? And you have the defendant on video admitting it. On top of that, you have Mr. Nelson giving the police two different stories. On top of that, you have Mr. Nelson lying about when he deleted his Facebook account. So this video not only establishes the underlying felony, but it also shows that at the time he was being interrogated, Mr. Nelson has a consciousness of guilt. So it's the most damaging piece of evidence that the state had. In terms of prejudice, just following on the ineffective assistance, I mean, discounting the video, let's assume it was never claimed, we still have the store video showing Marks and the defendant following the victims. We have Boone's testimony that the defendant patted the victim down before Marks shot him, which would support the idea of a robbery and a very active participation in the robbery. So why is the evidence, where's the prejudice, assuming that it should not have come in? Sure. I'll address the same piece of evidence as I can with my remaining time. You first mentioned the video. The video doesn't actually show a robbery and a shooting. It shows them following, certainly, and there's no dispute that Nelson was there. In terms of Ms. Boone, I'll address her testimony. She said that there was a pat-down. A pat-down can be just as consistent as a search for weapons as it is to try to find something to steal. One thing I would note that Boone said was, and she said that Marks had told the victim, up your shit. And according to the prosecutor at trial, that meant, give me your stuff, essentially. However, Boone said that to her, that meant there was going to be a fight. And in response to that, Boone took her boyfriend's cell phone and put it in her pocket. The jury can infer from that that the reason why she did that was to protect the cell phone from being broken in the fight. She also testified in the history of an animosity between Mr. Marks and her boyfriend, Thayer. She said that recently she had rejected Marks' romantic advances. So a jury can look at that and say, okay, Marks may have been angry at them and wanted to do them physical harm, not just rob them. She also didn't testify specifically as to Marks and Nelson trying to take any particular object from her. Granted, she vaguely testified that they tried to rob them, but they had money, they had phones, they had other items. Shouldn't say that they went after a particular thing. Nothing was taken from them. And one last thing I would add in terms of the prejudice analysis, two things. One is there was an initial trial that resulted in a hung jury. That suggests the evidence was close. And the second thing is we have argued a claim of cumulative error. So if this court thinks that the evidence is not close enough to warrant reversal on this claim alone, we have raised other issues with other heirs. And potentially in the cumulative error analysis, it's our position to outward warrant a new trial. Mr. Faulks, I see your time is up. You'll have an opportunity in rebuttal. Justice Hedl, any questions at this time? Counsel, do you plan on addressing the text messages in your rebuttal? I wasn't, but I can if you ask me a question about it. I'd like to hear about it. No other questions.  Ms. Bella. Good afternoon, your honors. Counsel, may it please the court. My name is Jamie Bella, and I'm here on behalf of the people of the state of Illinois. As counsel noted, there are several issues in this case, all of which have been fully briefed. However, because of the time limitations and oral argument, it's unlikely that we'll be able to address each of the issues individually. I will also be addressing the waiver issue, as defense counsel did. In addition, I'll be addressing the second part of defendant's issue number three with regard to the text messages and the cell-up-write, I don't know if I'm saying that right, software that's used to extract the messages. With regard to any of the issues that we're unable to address today, the state will stand on its arguments as they're presented in the brief, unless your honors have any specific questions with regard to those issues. Turning to the first issue regarding the Miranda waiver, the defendant argues that the trial court allowing the video to be admitted into evidence was a plain error, and that in the alternative, that counsel was ineffective for failing to object to the admission of the video. As I argued in the brief, the section 114-11 of the Code of Criminal Procedure allows the criminal defendant to suppress video statements that were provided by him to police prior to trial. When a defendant does raise such a challenge, the trial court is required to conduct a full hearing on the issue of the voluntariness of the statement itself. The burden in that hearing is on the state to prove that the statement was voluntary, and once the state has established a prima facie case for voluntariness, the burden shifts to the defendant to then prove that the statements were not voluntarily given. As counsel and defendant acknowledges on appeal, this issue was not presented in the trial court, and therefore no section 114-11 hearing was held, and none of the factual issues that are attendant to the video itself,  But not impossible to hear, and that would be the, other than perhaps officers filling in blanks, that there really are blanks. I mean, the video is it for purposes of the hearing and legal analysis, right? With respect to the actual conduct between the officer and the, however, with this particular video, and as counsel noted in his argument, there's one specific moment in the video where the defendant claims that he was threatened, and that the statement was after the defendant asked, what do, what happens if I don't answer your questions? And then the responding officer, which I believe was Hulse, there's two officers in the room, in the very beginning of the statement as the officer began to speak, he says, either, I mean, I think that it's in dispute whether he said, you're going to be charged with murder, you can be charged with murder. There's several different variations of what the beginning part of that sentence was, that I listened to the video multiple times, and no matter how slow or fast or loud or soft I play the video, over the screeching sound that's going on, it's impossible for me to hear. And I think the fact that there's any question about that at all is really a factual issue. And I understand that counsel declares, you know, as an officer of the court, what it says, but I think that it's not his position or mine to say specifically what is said when there's any, if there's any question at all about what the officer said. Do you agree, though, that the next sentence that the officer said was, it can happen? It can happen, which I think that, yes, which to me lends support to the idea that he said you could be charged with murder, not you're going to be, which is an assertion versus a possibility, where his follow-up statement that it can happen is more suggestive of the idea that he was letting the defendant know that there's a possibility he can be charged with murder. So I think that given this, and there's no question that the trial court and the jurors, who were the first ones to raise the issue of their inability to discern what was being said specifically in the video, raises questions about who decides what is actually said. And if the court needed the officer to be brought into court to testify about what was said or for them to make arguments about what was said, the appropriate time for that was in the trial court. And I think the fact that that was not done kicks the factual issues to the appellate court, which makes this case fall under the holding in Hughes where the Supreme Court said  I do note that in the reply brief, the defendant points out, and I agree that courts do review these type of issues under the plain error analysis, but that is not true in every single case, and specifically the case that the defendant relies on, the Fourth District case of people being cat-battled in the Fourth District. In that case, the defense counsel did file a motion to suppress, and a full hearing on the issue was conducted in the trial court, and the issue that was raised in the trial court was whether the statement was admissible due to the defendant's intellectual disability, rendering his ability to make a knowing and voluntary statement a waiver. So the trial court held the hearing and then later denied the motion. On appeal, the defendant reasserted that same argument, that his intellectual disability rendered the voluntariness of his statement impossible, but he added two additional issues regarding the admissibility, which was that the police failed to respect his invocation of counsel, and that his will was overcome by the officer's threats, and the offers of help were conditioned on the defendant's confession. So on appeal, in finding that the defendant did not voluntarily waive his Miranda rights, the Fourth District recited the full paragraph of the findings that were offered as evidence at the hearing as to the reports from the doctors. There's a full paragraph in paragraph 23 reciting bit by bit what the various doctors concluded as to that specific defendant's intellectual disability, and finding that he had an IQ of, I think it was 54, they determined that that alone was enough to render his waiver impossible. So, and specifically, and I quoted this language importantly because I think that this is the very specific reason that Hughes controls where this Caddell case is not the same. So the court found because the issue of the defendant's involuntary waiver due to his intellectual disability was raised in the trial court, we do not need to conduct a plain error analysis. Instead, we simply find that the defendant was incapable of waiving his Miranda. Based on that finding that the trial court erred in denying the motion to suppress, the court went on from there to find that since plain error occurred there, they addressed the next issue, which was whether the officer had failed to respect the defendant's invocation to have counsel present. So in that case, the reason that the plain error doctrine was available was because the trial court, first of all, had a full record of the hearing and all the evidence and arguments that were raised by the parties in the court below, which gave them the factual basis to determine whether the defendant's intellectual disability rendered him incapable of waiving his Miranda rights. So, going back, if I may, to the ineffective assistance, there is this factual dispute. Yes. So I know oftentimes on direct appeals, for the second direct appeal, ineffective assistance of counsel can be alleged, but from time to time, appellate courts have said, you know what, the factual record as we have it now is insufficient for us to actually decide this, and we decline considering the ineffective assistance and say, that's for a post-conviction hearing where this could be fleshed out. This almost seems like it would be a circumstance for that approach if there's really a dispute as to what was or wasn't said by the officer. Yes. I think that in the Hughes decision, it discusses that to some extent about whether, and it was actually brought up in the dissent, about whether or not the appropriate standard of review, where there is no factual findings in the trial court, was properly recognized and acknowledged on appeal. But then the court talks about how, I believe, and I don't have the Hughes in front of me, but if I'm not mistaken, Hughes was remanded for that specific decision because of the issue as it was presented. I think it was maybe, I'd have to look. I'd be guessing if I said right now. But the primary issue in Hughes was that it was inappropriate on appeal with those factual determinations not being made in the trial court. And I think that because of this, if this video was clear and there wasn't any question, I think the trial court in both trials, now in the first trial it was an even bigger issue, and even by the time the second trial went around, there was no, it wasn't improved enough that they still weren't having this issue. And it took up a substantial amount of time having IT come in and work through this video. And both videos are included in the record, the initial one, and then the improved version, which, again, to me, I think that the very first words that he uttered in that sentence are controlling. I think that they resolve the issue, but I think that there's a question about what he actually said. And I think that's kind of the important point. And in Hughes, the Supreme Court really railed against the idea that all of these determinations were made on appeal. And I believe that for that reason, Hughes is controlling, whereas Caddell is just completely different, that the waiver issue in that case had nothing to do with the actual issue he raised in the trial court. And regarding your question about the ineffective assistance of counsel, half of this argument, for the most part, the state will rest on its arguments that are presented in the brief. But I think that in the defendant's reply brief, where it touches on the issue of invited error, I think that factors into both whether the trial court erred and whether there was an ineffective assistance of counsel claim. Because over and over again, now, during the entire record, the only person who ever raised the question about whether this video should be offered at trial and played for the jury was the judge himself. And the judge's concern was, specifically, that the jury's not going to be able to hear them talking, but there's a very substantial possibility they'll misunderstand what is being said. And I don't remember the specific example the judge used, but something about sinking the Titanic, and the jury might hear from the video that, yes, they sunk the Titanic, when that's not, in fact, what was said. So as the judge raised this concern, both parties made suggestions about how to get the video into evidence. And again and again, defense counsel asserted that he wanted the entire video played. And then when it came to closing arguments, counsel repeatedly asked the jury to pay very close attention to the video and to watch it over again, so that they could hear the defendant repeatedly denying that he ever patted down the victim in this case. And I think that, first of all, that invited the video to be offered, because even though counsel himself did not offer the video, he acquiesced in its admission to evidence, which undercuts the idea that he had any kind of objection at all as to his admissibility, whether that's for voluntariness, for reliability, for any of those reasons, because counsel had an opportunity. And in the moment where the judge himself suggested the possibility that the video not be played at all, counsel actually did not. He could have, at that point, had the video excluded, and I think that the judge would have probably granted it, even if it were on different grounds. But counsel insisted that the full video be played and that they make whatever corrections they could with IT. And because he argued so vehemently on closing arguments that the jury needs to really listen to this video and understand what the defendant is denying he did, I believe that that is pretty significant evidence that having the video statements for the jury was, and it was counsel specifically, who asked that the video be made available to the jury rather than just played at trial and then not sent back for the jury. Can you address Justice Heddle's question regarding these text messages and how they possibly come into evidence? Yes, so there was... Sorry, I editorialized. How are they coming into evidence? Probably. So there's two kind of alternative... Well, not alternative. There's two separate arguments on the third issue. The first relates to foundation and prejudice. The second relates... Or, I'm sorry, relevance and prejudice, and then the second half relates to foundation. Maybe focus on the relevance. On the relevance? Experiment with relevance. Okay. Okay, so with the... And, of course, I brought the... The majority of my notes related to foundation. However, the text message conversation... So as counsel and your honors know, the defendant in this case was charged on felony murder predicated on an attempted robbery. The co-defendant, Marks, the 14-year-old, is the one who actually had the gun and shot the victim, who later died. The defendant was convicted on the murder, on the accountability theory. In this conversation, the conversation... The defendant and the co-defendant, Marks, Xavion Marks, were both in the conversation, and they're discussing within the conversation itself obtaining guns for... And to hit a lick, I think, or to pull a lick or something like that, which the officer testified that, during his experience as a detective and repeatedly encountering this type of language, this type of slang, was indicative of a robbery. And so the conversation itself was prior to the attempted robbery slash... When you say prior, months prior. I believe it... I want to say... Is that right? I think they said it was two months prior, or I believe... Just a few days over two months, and the specifics of it, you're correct, were about... Hitting a lick. Yeah, it's very slang. Yeah. Any specifics as to how they were going to do it or as it related to the victim? I didn't bring the specific text with the specific victim. Well, I think it's a general discussion. They're not naming any one victim. There was one text message where they were discussing... Is it okay if I conclude? Please. And just assuming that those aren't the issues, what makes it relevant if it was two months ago, and there's nothing specific other than they were going to rob some people to get some money to buy some guns? Well, the defendants... The defense theory for the large part was that there wasn't any attempted robbery at all, and that if one took place, it was entirely on Marks, the co-defendant, and that the defendant didn't... That this was a surprise to him. And when Marks told him that he was going to do this, his reaction was no, no, no. So I think it goes to show that there was no... I think actually what the state argued in the trial court was specifically that it goes to show specifically that there was no surprise. The defendant was very aware that this idea of hitting a lick and using guns to hit a lick was something that they had discussed previously. And considering the fact that the accountability theory requires some proof that he conspired with this co-defendant, this conversation that took place with the co-defendant where they were planning robberies, whether it was the specific victim in this case, it sounds more like these were robberies that were happening kind of at random and that there were... They weren't talking about robberies they'd done. They were talking about something they were thinking about doing, correct? Well, I think in one of the conversations they had... Or maybe the detective had testified that the only way that this conversation came about or came into evidence originally was from a different case involving a different robbery that one of the parties was involved in, so... And in this case, nothing was taken, right? That we know of. That we know of, no. I think that Boone, the girlfriend that was with him, had his phone. He had a couple dollars in his pocket and a bottle of water, I think, five dollars, and a bottle of water, I think. But they fled, and I don't think when the officers arrested him that he had anything belonging to the victim. But, so... I think that's why this charge is an attempted robbery. Just to tap before any other questions. No, nothing. Thank you. Thank you, Your Honor. Mr. Golthus, or Boone? It's a bit maddening that we're now at oral argument and we can't agree as to whether the video was clear. Particularly when the party's position in trial court was that the video was sufficiently given to the jury. As an officer of a court, I am telling you that the part of the video where the detective tells Mr. Nelson, well, you're going to be charged with first-degree murder, is clear. And I urge Your Honors to watch the video if you haven't already. I know it's not my job to ask Your Honors questions, but I would love to know if you've had a chance to watch the video. Counsel, I can tell you that I have. And follow that with a question. Defense counsel was the one that asked for this repeatedly to be did not object and then gave suggestions as to how, obviously, there is some good that comes out of this video for its client. Wasn't that a strategic decision? No. I'll say two things in response to that. Number one, the vast majority of the thing that opposing counsel cites was defense counsel's concern that the judge was like, okay, what if we just forget about the video and just have the detective come up and testify as to what was said? And defense counsel was like, no, not a good idea because I've seen many times where an officer testifies to the substance of the conversation and that officer's testimony does not match what was actually said. So when defense counsel was looking at having either the video presented or an officer testifying to the substance, he very clearly conveyed to the court, I want the video to come in. Let's try to get this video fixed. I don't want to waste your time with more questions, but would I find that in the second trial transcript? That is the first trial on pages 350 through 372. Thank you. I won't read to you. But are we reviewing the second trial? Yes. The issue with the quality of the video came up in the first trial, so it didn't have to be addressed again in the second trial. In terms of we already reached invited air, counsel argued that the record isn't factually developed for the issue of Miranda waiver. Again, it's on video. That's all the court needs. The facts are there. In terms of the text messages, the text messages do not establish that Mr. Nelson and Mr. Marks had ever committed a prior robbery together. They are general discussions about robbery, about buying guns, and that's it. It's propensity evidence. As to foundation, the price case that I've cited in my brief establishes that documents that are generated using Celebrate are computer-generated records. Celebrate is a machine that generates computer-generated records. Therefore, you have to establish the additional foundational requirements for a computer-generated record. The state did not do that. We didn't show that Celebrate was regularly tested, that it was validated to ensure accurate results, that it was in good working order, that it was working properly with the time it was used, and that how the state knew that the results were accurate. You have to establish all those things for assuming the price. The state didn't even come close to doing that. It's really an insufficient foundation. I would make one more comment on this disagreement about whether or not what was said on video actually exists. You know, if I, as an officer of the court, am telling the court that this is on video and the opposing counsel watches the video and doesn't quite hear what I'm saying. This is not a rhetorical question. Do you have case law for the proposition that an appellate lawyer is able to say, as an officer of the court, the evidence is X? I just never heard someone say that before, which doesn't mean it's true, but I've never seen that. No, I say officer of the court because I owe this court a duty of candor. So when I say I hear something on video and I put it in a brief, it means because I actually heard it. Can you finish that second clause of your statement that you started to say, if opposing counsel disagrees with what I heard on a video that I represent in my brief? Make a phone call to the office of the state appellate defender saying, hey, I didn't hear this. Maybe it's an issue with my video. Maybe it's an issue with my computer. Would you mind if I – could you assist me? Can I watch it on the player that you watched it on so we can all be on the same page? Because ultimately, we're pursuing a just result. We're pursuing justice. And we all want to reach a correct result. And if there's a dispute, reach out to me because I would have done the same to her. And with that, I thank the court for its time. And we ask that you reverse. Does Heather have any questions? No, sir. We thank both parties for spirited presentations. We will take the matter under advisement and render a disposition in due course. Thank you very much.